# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

EUGENE TERRANCE, as Personal Representative
for the Estate of EVERETT L  TERRANCE,
Deceased

      Plaintiff,

v

                              Case No  99-CV-74433-DT-DT
                              Hon  Lawrence P  Zatkoff

NORTHVILLE REGIONAL PSYCHIATRIC
HOSPITAL, MICHIGAN DEPARTMENT OF
MENTAL HEALTH, H  BLANDA, M D ,
ARDESHIR EMANI SAID, M D , O R  LEE, M D ,
DR  SADASIVAN, M D , SHIRLEY OWENS, R N ,
B  FANNING, O T , DR  NAIR, DR  KIM, DR
PAN, and DR  ALMASI, jointly and severally,

      Defendants

| | |
|---|---|
| GEOFFREY N  FIEGER (P30441) | MARK S  MEADOWS (P24101) |
| TODD J  WEGLARZ (P48035) | Attorney for Defendants |
| Attorneys for Plaintiff | Assistant Attorney General |
| FIEGER, FIEGER, SCHWARTZ & KENNEY, P C | Mental Health Division |
| 19390 W  Ten Mile Rd | One Michigan Avenue, Suite 300 |
| Southfield, MI  48075 | Lansing, Michigan 48909 |
| (248) 355-5555 | (517) 373-6096 |

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now Comes Plaintiff, by and through his attorneys FIEGER, FIEGER, SCHWARTZ

& KENNEY, P C , and for his Response to the Defendants' Motion for Summary Judgment,

states as follows

1      Admit

2      Plaintiff neither admits nor denies and leaves Defendants to its proofs

3      Vehemently denied for the reasons set forth in the accompanying Brief

FIEGER  FIEGER  SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD  MICHIGAN 48075 2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

4 Vehemently denied for the reasons set forth in the accompanying Brief

5 Admit

WHEREFORE, Plaintiff respectfully requests this Honorable Court to deny the relief requested in the Defendants' Motion for Summary Judgment

Respectfully submitted,

**FIEGER, FIEGER, SCHWARTZ & KENNEY, P.C.**

GEOFFREY N FIEGER (P30441)
TODD J WEGLARZ (P48035)
Attorneys for Plaintiff
FIEGER, FIEGER & SCHWARTZ, P C
19390 W Ten Mile Road
Southfield, MI 48075
(248) 355-5555

DATED June7, 2000

---

**PROOF OF SERVICE**

On June 7, 2000, via First Class Mail, a copy of the foregoing was served upon all counsel of record at their respective addresses  I declare under penalty of perjury that this statement is true to the best of my knowledge, information and belief.

Susan L. Jarvis

---

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

EUGENE TERRANCE, as Personal Representative
for the Estate of EVERETT L TERRANCE, Deceased

      Plaintiff,

                                   Case No  99-CV-74433-DT-DT

v                                     Hon  Lawrence P Zatkoff

NORTHVILLE REGIONAL PSYCHIATRIC HOSPITAL,
MICHIGAN DEPARTMENT OF MENTAL HEALTH,
H  BLANDA, M D , ARDESHIR EMANI SAID, M D ,
O R  LEE, M D , DR  SADASIVAN, M D , SHIRLEY
OWENS, R N , B  FANNING, O T , DR  NAIR, DR  KIM,
DR  PAN, and DR  ALMASI, jointly and severally,

      Defendants

---

| | |
|---|---|
| GEOFFREY N  FIEGER  (P30441) | MARK S  MEADOWS (P24101) |
| TODD J  WEGLARZ  (P48035) | Attorney for Defendants |
| Attorneys for Plaintiff | Assistant Attorney General |
| FIEGER, FIEGER, SCHWARTZ | Mental Health Division |
|   & KENNEY, P C | One Michigan Avenue, Suite 300 |
| 19390 W  Ten Mile Rd | Lansing, Michigan 48909 |
| Southfield, MI 48075 | (517) 373-6096 |
| (248) 355-5555 | |

---

## PLAINTIFF'S BRIEF IN RESPONSE TO
## DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

FAX (248) 355-5148 · TELEPHONE (248) 355 5555 · SOUTHFIELD  MICHIGAN 48075 2463 · 19390 WEST TEN MILE ROAD · ATTORNEYS AND COUNSELORS AT LAW · A PROFESSIONAL CORPORATION · FIEGER, FIEGER  SCHWARTZ & KENNEY

## STATEMENT OF THE ISSUES PRESENTED

### I.

**WHETHER DEFENDANTS' CONDUCT IN THIS CASE ESTABLISHES A VIOLATION OF 42 USCA §1983 ENTITLING PLAINTIFF'S DECEDENT TO MONETARY DAMAGES**

Plaintiff answers "Yes"

Defendants answer "No"

## CONTROLLING AUTHORITIES FOR RELIEF SOUGHT

42 USC §1983

*United States Constitution, 8th Amendment*

*United States Constitution, 14th Amendment*

*Youngberg v Romeo, 457 US 307 (1982)*

*Williams v Mehra, 186 F3d 685 (6th cir 1999)*

*Estelle v Gamble, 429 US 97 (1976)*

*Bass v Wallenstein, 769 F2d 1173 (7th Cir 1985)*

TELEPHONE (248) 355 5555 • FAX (248) 355 5148

SOUTHFIELD MICHIGAN 48075-2463

19390 WEST TEN MILE ROAD

ATTORNEYS AND COUNSELORS AT LAW

FIEGER FIEGER, SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION

# TABLE OF CONTENTS

Statement of Issues Presented ............................................................. i

Controlling Authorities for Relief Sought ......................................... ii

Table of Contents ............................................................................... iii

Index of Authorities ........................................................................... iv

Index of Exhibits ................................................................................. v

Introduction/Statement of Facts ......................................................... 1

    1  Testimony of Plaintiff's Psychiatric Expert, David Schwartz, MD ...... 11

    2  Testimony of Plaintiff's Cardiology Expert, Robert Stark, MD ...... 12

**Argument**

**I.**     **42 USC §1983 CLAIMS AGAINST INDIVIDUAL DEFENDANTS**

      **A.**    **Plaintiff has claims against the individual
             Defendants for violating his rights under the 8th and
             14th Amendments of the United States Constitution** ...... 15

             **Defendant Ardeshir Emani Said, MD** ...... 18

             **Defendant O.R. Lee, MD** ...... 18

             **Defendant Shirley Owens, RN** ...... 20

             **Defendant Dr. Almasi** ...... 21

             **Emergency Medical Team Defendants** ...... 22

      **B.**    **The individual Defendants are not entitled to qualified
             immunity** ...... 23

**II**    **PLAINTIFF'S CAUSE OF ACTION AGAINST NRPH AND
       MICHIGAN DEPARTMENT OF MENTAL HEALTH** ...... 25

Relief Requested ...... 25

FAX (248) 355 5148 • TELEPHONE (248) 355 5555 • SOUTHFIELD MICHIGAN 48075 2463 • 19900 WEST TEN MILE ROAD • ATTORNEYS AND COUNSELORS AT LAW • A PROFESSIONAL CORPORATION • FIEGER, FIEGER, SCHWARTZ & KENNEY

## INDEX OF AUTHORITIES

**FEDERAL CASES**

Bass v Wallenstein,
769 F2d 1173 (7th Cir , 1985) — 23, 24

Boretti v Wiscomb,
930 F2d 1150 (6th Cir 1991) — 17

Estelle v Gambele,
429 US 97 (1976) — 23, 24

Farmer v Brennan,
511 US 825 (1994) — 16

Harlow v Fitzgerald,
457 US 800 (1982) — 23

Mandel v Doe,
888 F2d 783 (11th Cir 1989) — 17

Reed v Dunham,
893 F2d 285 (10th Cir , 1990) — 17

Weeks v Chabowdy,
984 F2d 185 (6th Cir 1993) — 17

Williams v Mehra,
186 F3d 685 (6th Cir 1999) — 15, 16, 17

Youngberg v Romeo,
457 US 307 (1982) — 15

**FEDERAL STATUTES**

42 USCA § 1983 — 1, 15, 16

**INDEX OF EXHIBITS**

**A**   Psycho-social Assessment dictated by Paul Moran, MSW

**B**   Autopsy report dated September 28, 1995 by Assistant Medical Examiner Carl J Schmidt, M D

**C**   Dep  John Delinski taken on June 18, 1998

**D**   Schematics of "C" Ward dated September 23, 1996

**E**   Dep   Mehdi Almasi taken on June 16, 1998

**F**   Dep   Ok Rhyun Lee, M D  taken on June 18, 1998

**G**   Dep   Ardeshir Said, M D  taken on June 16, 1998

**H**   Hot Weather Precautions from Dept  of Mental Health dated June 9, 1995

**I**   Dep  Dr  Robert Stark taken on August 30, 1999

**J**   Admitting H&P done byDr  Said on 6-20-95

**K**   Abnormal EKG's

**L**   Discharge Summary dictated by Dr  Lee dated September 8, 1995

**M**   Dep  Dr  Govindan Sadasivan taken on June 19, 1998

**N**   Progress Notes from Northville Psychiatric Hospital for admission of 6/19/95 to 7/31/95

**O**   Treatment Plans and Clinical Status Reports from Northville Regional Psychiatric Hospital for 6/29/95 and 7/6/95

**P**   Orders - CAT

**Q**   Work therapy records from Northville Regional Psychiatric Hospital

**R**   Escape Precautions Sheet from 7/6/95 to 7/10/95

**S**   Maintenance records for June, 1995

**T**   Comprehensive Nursing Assessment dated June 23, 1995

FIEGER FIEGER SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD  MICHIGAN 48075 2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

FIEGER FIEGER SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION    ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD    SOUTHFIELD MICHIGAN 48075 2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

| | |
|---|---|
| **U** | Physician's Initial Treatment Plan and Orders from Northville Psychiatric Hospital from 6/19/95 to 7/31/95 |
| **V** | PDR re Haldol |
| **W** | Dep  Dr  David Schwartz taken on August 27, 1999 |
| **X** | Dep  Sherley Owens, R N  taken on June 18, 1998 |
| **Y** | Defendant NRPH's Answers to Plaintiff's Third Interrogatories and Request to Produce dated December 10, 1998 |
| **Z** | Med  Administration records |
| **AA** | Security Log |
| **BB** | Death Summary dictated by Dr  Said on August 7, 1995 |
| **CC** | Dep   Dr  Ramachandran Nair taken on June 19, 1998 |
| **DD** | EMS Run Sheet dated July 31, 1995 |
| **EE** | Dep  Michael Burrough taken on December 22, 1998 |
| **FF** | ER record from St  Mary Hospital dated July 31, 1995 |
| **GG** | Dr  Robert Stark's letter dated October 24, 1996 |

v1

**INTRODUCTION**

Plaintiff concedes the only issue before this court is whether the conduct alleged on the part of Defendants amounts to a violation of 42 USCA § 1983, entitling Plaintiff to money damages  After reviewing all of the evidence in favor of Plaintiff, a prima facie case will be established   Should this court be convinced that Plaintiff has presented sufficient evidence to present a claim under §1983, but that Plaintiff's Complaint lacks some of the particular factual allegations discussed below, Plaintiff requests leave to amend his Complaint, in the interests of justice, for the purpose of conforming the pleadings to the evidence thus far discovered

**STATEMENT OF FACTS**

On July 31, 1995, 35 year old American Indian Everett Terrance, involuntarily confined to Defendant Northville Regional Psychiatric Hospital (NRPH), suffered a horrific and inexcusable death - right under the noses of his treatment "professionals" - in the form of heat stroke (hyperthermia) secondary to heat exposure and his excessive psycho-tropic medications (Haldol and Benzotropine) (**Ex A, Ex B**)   The bigger tragedy is that the individual defendants were aware of the conditions and  the obvious danger those conditions presented to decedent, yet did nothing to stop the predictable and inevitable outcome

The  facility is a massive and sterile compound, reminiscent of the Soviet era with its large, mundane, repetitive buildings composed of thick mortar and single-pane windows trimmed by dull gray aluminum  During the winter, the entire facility relies upon a central steam heating system (**Ex C, pp 4-5, 11-12**)  Boiling hot steam travels from the main boilers on the compound  through  large  underground  insulated  pipes,  which  make  their  way  through  the

1

basements of the buildings and into the "wards"(**Ex C**, pp 13-16)  One of these steam pipes runs under ward "C" which contains a unit referred to as C1 - 1 South (C1-1S)  Because the kitchen/cafeteria area functions on steam heat, it was necessary to keep this main pipeline open all year round, even during the summer (**Ex C**, pp 16, 20-23, **Ex D**)

Employees of NRPH will tell you they do not look forward to the summer season  The entire facility lacks air conditioning and a modern ventilation system  Plaintiff's decedent's primary treating internist, Defendant Dr Said, testified *none* of C ward's rooms or units were air conditioned (**Ex G**, p 68)  Though some of the other personnel testified there was a single small air conditioning located in the rear day room, the evidence shows it did not function (**Ex F**, pp 11-12, **Ex X**, pp 41-41)  The result of this combination of year- round steam, and lack of air conditioning and ventilation, was an unbearable and intensely heated environment for patients  In the summer, C building, in particular C1-1S, was hotter than any other part of the hospital (**Ex C**, pp 24-26, **Ex E**, p 49, **Ex F**, p 10)

The patients in C ward are psychiatric patients who are almost always on psychoactive drugs  Defendant Dr Said testified that "anybody who was on psychoactive drugs  is subject to hyperthermia" (**Ex G**, p 32)  He further testified that since he has been at Northville, he has witnessed at least 7-8 prior cases of non-fatal hyperthermia (all were on psycho-active drugs), and 2 to 3 prior fatal cases (**Ex G**, pp 32-36)  Dr Said underscored the seriousness of hypothermia by stating that it carries a 25% mortality rate (**Ex G**, p 32)

These patients susceptibility to heat stroke during the summer months is such a significant and serious concern of the hospital staff that every year a memo is submitted to all

2

treating medical personnel advising of the following warning and protocol (**Ex H**)

> During spells of hot weather, **certain recipients** are **highly susceptible** to dehydration, heat exhaustion and **heat stroke**  The **recipients** at risk are those **receiving phenothiazines, anti-cholinergics, and diuretics**      Those with **cardio-vascular diseases** are considered to be at **high risk**

> When the temperature inside the wards       reaches 80°F or higher, recipients should be offered rest periods, loose fitting cotton clothing, fans, extra showers, clean sheets, and extra fluids

> When the inside temperature exceeds 90°F or higher, those patients       with cardio-vascular disease should have vital signs recorded three times daily and be advised to **avoid strenuous exercise**, in addition to the above measures

Everett Terrance had been involuntarily admitted to Defendant NRPH on June 19, 1995, for treatment for auditory hallucinations, depression, erratic mood swings, and paranoid delusions(**Ex  L**)   He was administered   **Haldol (a phenothiazene), Cogentin (an anticholinergic),** and **Lithium** (**Ex G,   Ex H**).  Haldol and Lithium, in particular when administered together, placed him at risk for heat stroke ( **Ex M,** pp 27-30, **Ex V,** Haldol, **Ex W,** pp 21-22)  Mr Terrance also had pre-existing heart conditions including hypertension requiring medication (Amlodipine 5 mg daily **Ex U,** 6/20/95), sub-sternal chest pain, abnormal EKG's, and hyperlipidemia (triglycerides of 300 and total cholesterol of 220)  (**Ex I,** pp 15-16, 44, **Ex J, Ex K, Ex N,** 6/27/95)   *Thus, as defined in Defendant's own memo, Mr. Terrance was at high risk for heat stroke.*

These summer weeks were particularly dangerous to the patients in C1-1S as it was unusually hot  The Court may recall that many elderly Chicago residents died from the intense heat in the summer of 1995  The heat danger to Mr Terrance was exacerbated by the location

3

FIEGER  FIEGER  SCHWARTZ & KENNEY  •  A PROFESSIONAL CORPORATION   ATTORNEYS AND COUNSELORS AT LAW   19390 WEST TEN MILE ROAD  •  SOUTHFIELD  MICHIGAN 48075 2463  •  TELEPHONE (248) 355 5555  •  FAX (248) 355 5148

of his room   Room 122 is directly above a main steamline (**Ex C**, pp  43-44, **Ex D**)

In June and July, the NRPH was in the middle of an asbestos abatement program where asbestos pipe insulation was removed and replaced with fiberglass (**Ex C**, pp  37-38, **Ex S**)  The exposure of the bare pipe caused more heat to emanate until new insulation was applied (**Ex C**, pp  35-36)  Mr  Terrance's room was located above the pipe abated   (**Ex D**)

Unit C1-S1 was covered by staff psychiatrist Defendant  Dr  Lee   (**Ex J, Ex F, Ex R**)  When Dr  Lee was on vacation,  Dr  Sadasivan covered the unit  (**Ex F**, pp  18, 22, **Ex M**, pp 4, 10-11)  Dr  Sadasivan saw Mr  Terrance on six occasions   June 20, 27, 30, July 7, 10, 11   (**Ex M**, pp  34-35)  Defendant Dr  Lee saw and treated the patient on July 5, 13, 17, 18,19, 25, 27, and 31   (**Ex F**, pp  22, 41, 50, 54, 57, 60, 63, 69, **Ex N**)

Mr  Terrance was also treated by internist Defendant Dr  Said, who was responsible for overseeing all of the "medical" problems of this patient on an "as needed" basis   (**Ex G**, p 11)  Dr  Said saw and treated this patient more than any other physician at NRPH, on 15 separate days   June 20, June 21, June 22, June 23, June 26, June 27, June 30, July 12, July 13, July 14, July 18, July 19, July 21, July 26, and July 31   (**Ex N**)   The remainder of Mr  Terrance's assigned medical team included primary therapist and nurse Defendant Owens, and occupational therapist Defendant Barbara Fanning   (**Ex O**)

Defendant Dr  Lee testified that he knew the heat in the building (and out) was a "danger" to the patients during this time  Defendant Dr  Said substantiated this by testifying "medically I would recommend that it should be air conditioned"   (**Ex F**, p 12, **Ex G**, p 69)

On June 23, 1995, Defendant Owens generated a Comprehensive Nursing Assessment

4

on Mr Terrance, concluding he had problems following directions and required staff supervision in off-ward activities (**Ex T**, pp 4-5) On June 27, 1995, Dr Sadasivan ordered Mr Terrance to attend CAT (centralized activity) in the morning, and work therapy in the afternoon for four weeks Work therapy can take place either within the ward or in the workshop (**Ex M**, pp 18-19, 34, 40-42, **Ex P**, 6/27/95) Mr Terrance was scheduled to work at the Quick Oil Change Program from 9 to 11 30 am, and at the workshop from 1 30 to 3 30 pm, Mon to Fri (**Ex Q**)

On July 6, 1995, his first day at the Quick Oil Change Program, Mr Terrance "wandering off" and was apprehended by security and returned to the ward several hours later at about 2 00 pm (**Ex N**, 7/6/95) Defendant Dr Lee placed Mr Terrence on "escape alert," a hospital protocol calling for intense supervision, including no off ward activity and observations of his whereabouts every 15 minutes (**Ex N**, **Ex R**) The escape alert was discontinued on July 10 by Defendant Sadasivan after the following evaluation

> I talked to him "Do you still feel like escaping?" He said "No," so I discontinued the escape alert on July 10[th] (**Ex M**, p 44)

Perhaps not coincidentally, on this date the only alleged air conditioning unit within the ward, the small unit located in the rear day room, was noted to be "not working", and same was not attended to until seven days later (**Ex S**, 7-6, 7-13/95)

The next day, July 11, 1995, Mr. Terrance expressed to Defendant Nurse Owens his desire to return to the CAT program Nurse Owens decided he should not leave the ward until the following Monday (which would be July 17)(**Ex N**, 7/11/95@1 42pm)

Mr Terrance's physical condition seemed to be stable until July 12, 1995, when he

5

complained of feeling weak  Dr  Said ordered tests which indicated a serum lithium level of 1 2,

and a blood sugar of 90 (no signs of hyperglycemia)   (**Ex N**, 7/12/95)

On July 13, 1995, Nurse Owens had obviously disregarded her prior decision to keep Mr

Terrance on the ward through July 17   The possession of an activity card places Mr  Terrance

outdoors from 9 to 11 30 am, and from 1 to 3 00 pm   (**Ex Y**, #2)  Dr Lee also saw the patient

that morning, noting he was perspiring in the hot weather  Mr  Terrance's chart indicated "Pt

*returned* to ward c/o chest pain "  He also had a blood pressure of 140/110 (elevated), prompting

an EKG to be ordered stat (**Ex N**, 7/12/95@10 35am)   Because of the hot weather and his

elevated blood pressure, Dr  Lee decreased Mr  Terrance's Lithium to 600 mg am and pm, and

(appropriately) withheld his activity card through Monday (July 17) (**Ex F**, pp 41-41, **Ex N**,

7/13/95@11 15am)   The EKG was interpreted as abnormal, and he was complaining of chest

pain, but Dr  Said's plan was "no action needed" (**Ex N**, 7/13/95)  He later acknowledged that

Mr  Terrance's diabetes was uncontrolled (but did nothing about this either)(**Ex N**, 7/14/95)

From July 15 through July 17, Mr  Terrance was noted to be drinking " lots of fluids" (a

sign of dehydration), was confused, and had become progressively agitated to the point of being"

non-responsive "  He began talking to himself and responding to voices   On July 17,  an

additional 5 mg of Haldol was given in the early morning hours, followed by a 100 mg injection

of Haldol Decanoate (a long acting version of Haldol which peaks in the body at 6 days, and has

a 3 week half life), given at 8 35 am   His daily doses of Haldol tablets were also increased by

Dr  Lee to 10 mg, twice per day (**Ex N**, 7/15/95 - 7/17/95, **Ex U**, 7/17/95)  The following day

he was under close observation because of "excessive water drinking"  Two days later, Dr  Lee

again increased the daily doses of Haldol to 20 mg twice per day, plus ordered an additional 5mg injection! She placed him on Paxil, another psycho-tropic drug increasing his risk for hyperthermia (**Ex F**, p 54, **Ex U**, 7/18-19/95) Dr Said then issued a plan to "observe for excessive water drinking" (**Ex N**, 7/19/95)

On July 25, Defendant Nurse Owens noted that Mr Terrance was complaining of a medication reaction and charted her findings of sweating and stiffness (**Ex N**, 7/25/95) Dr Lee was notified and she immediately ordered 2 mg of Cogentin to counteract the stiffness and hand tremor, side effects of the Haldol, followed by an order for 2 mg twice per day Haldol was also reduced to 5 mg at nighttime (**Ex F**, pp 60-61) Perhaps again not by coincidence, on the same day maintenance personnel were applying new installation to the elbows of the bare steam pipes directly below his room (**Ex S**, 7/25/95) This caused additional heat to emanate from the bare pipes into the ward above

On July 27, 1995, Nurse Owens charted no further complaints of reactions, and also noted Mr Terrance began to participate in activities with staff, including van rides with the occupational therapist, Defendant Fanning (**Ex N**, 7/27/95) On July 29, 1995, Nurse Owens noted her intention to refer him back to CAT and CTP next week (**Ex N**, 7/29/95)

Monday July 31, 1995, was an extremely hot day with temperatures at 95°F and humidity above 90% (**Ex L**, p 2) The Hospital's temperature chart, also passed out to employees during the summer months, indicates these conditions provide a "perceived" temperature of **148**! (**Ex H**) Pursuant to the hospital's own advisory, Mr Terrance was the type of patient who should have been in a cool room, definitely should not have been outdoors, and

7

FIEGER FIEGER SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 2463 • TELEPHONE (248) 355-5555 • FAX (248) 355 5148

certainly should not have been engaging in strenuous activity

Mr Terrance complained of a dry mouth at 6 30 am (obviously already dehydrated)   At 9 36 am Dr Lee decided it was the time that Mr Terrance start engaging in more off-ward (and hence outdoor) activities (**Ex N**, 7/31/95)   Once this was written in the chart by Dr Lee, the nursing staff ensured patient compliance with same (**Ex F**, p 69)

Sometime before 10 00 am Dr Said saw Mr Terrance and realized he had not received his blood pressure medication over the entire weekend *because the nurses forgot to remind him to renew the order!* Two blood pressure readings were taken, 130/104, and 130/110 (elevated) (**Ex G**, pp 45-49, **Ex N**, 7/31/95)   Dr Said **doubled** his medication, to compensate for the two days he went without this necessary medication   *The blood pressure medication order (amlodipine) for that day was also never carried out!* (**Ex Z**, 7/31/95)

There is nothing in Mr Terrance's chart accounting for his whereabouts until about 1 30 pm when he was seen staggering in the hallway near the nursing station, as a "very floppy body figure," and dressed in dark clothing (**Ex F**, p 83, **Ex L**, p 2)   Defendant Lee and Defendant Fanning helped Mr Terrance to a treatment room where Dr Lee noted him to be sweating, hot to the touch, and complaining he did not feel well (**Ex F**, pp 80-81)   Dr Lee instantly thought he was suffering from heat stroke and needed immediate treatment (**Ex F**, pp 82, 99), but would have to defer to Dr Said (**Ex F**, pp 100-101)

Dr Lee instructed Nurse Owens to page Dr Said STAT (**Ex F**, pp 84-85, **Ex X**, p 10) Nurse Owens did and talked directly to Dr Said, explaining to him that Mr Terrance was sweaty, confused, had an axillary temp of 103 5, and was restless to the point of not being

FIEGER, FIEGER, SCHWARTZ & KENNEY  •  A PROFESSIONAL CORPORATION  •  ATTORNEYS AND COUNSELORS AT LAW  •  19390 WEST TEN MILE ROAD  •  SOUTHFIELD, MICHIGAN 48075-2463  •  TELEPHONE (248) 355 5555  •  FAX (248) 355 5148

FIEGER, FIEGER, SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

cooperative  He was also told Mr Terrance had been outside (**Ex G**, p 60, **Ex BB**, p 1)  Dr Said told Nurse Owens he was on his way (**Ex X**, pp 12-13)

Mr Terrance's blood pressure was noted to be 170/90, and his mental confusion was deteriorating quickly (**Ex L**, p 2)  Dr Said was still not there  Dr Lee and Nurse Owens waited nearly an hour, until 2 27 pm, before finally calling a medical emergency (finally giving up on Dr Said)(**Ex L**, p 2, **Ex AA**)  Astonishingly, Dr Said did not arrive until 2 30 pm, nearly an hour after being paged STAT (Both Dr Lee and Nurse Owens testified there was a delay in Dr Said's response, and later filed a complaint to the Director of Medical Services, Defendant Dr Almasi (**Ex E**, pp 40-41)  Perhaps in an attempt to cover up his lack of diligence, the security log sheet indicates Dr Said phoned them at 2 32 pm to "cancel medical emergency"(**Ex AA**)

Dr Said immediately requested a rectal thermometer and was told it was missing (**Ex G**, pp 53, 64-65)  With Mr Terrance's axillary temp at 103 5, Dr Said estimated his core temperature to be 105 or 106, and diagnosed hyperthermia  (**Ex G**, p 53)  Dr Said told the nurses to remove Terrance's clothing  This could not be accomplished until more assistance was summoned due to his size  Mr Terrance then lost consciousness

Dr Said inserted an IV and placed wet towels over Mr Terrance's body  (**Ex G**, p 54)  Dr Said would have preferred to administer an ice water enema, but the ward lacked  enema equipment and the ice for that matter[1]  (**Ex G**, p 59, **Ex CC**, p 16)  Dantrolene, a drug used to treat hypothermia (when contributed to by psycho-tropic medications) is readily available on the market but was not stocked within the hospital (**Ex E**, p 22)

EMS was called at 2 32 pm, and arrived on the scene at 2 41, at which time resuscitative

efforts began(**Ex DD**)  Paramedic Michael Burrough, noted in the EMS report that one of the two iv's established by the NRPH staff t cool Mr Terrance's body was not functioning (**Ex EE**, pp 30-32, 34-35)  Mr Terrance was transferred to St Mary's Hospital, where resuscitative measures continued  He was eventually pronounced dead from acute cardiopulmonary arrest, hyperthermia and psycho-tropic medications (**Ex B, Ex FF**)

**Where was Terrance on 7-31-95 Between 10 00 a.m. and 1:30 p m ?** Defendants may argue that plaintiff's decedent remained within the ward the entire day prior to his death  The only evidence within decedent's medical chart which tends to support this scenario is Nurse Owens' hindsight Progress Note, entered well after the fact (**Ex N**, 7-31-95@3 17 pm)  Even assuming *arguendo* this were true, Plaintiff has still established a case against Defendants for their failure to keep Mr Terrance in a cool environment, Dr Said's failure to timely respond to the emergency call, and the failure to timely cool his body temperature

However, the most likely version, as repeatedly mentioned in the records,  is that Mr Terrence was off the ward engaging in strenuous physical activity on this very hot and humid day  The autopsy report states decedent "was out in the sun when he became agitated and confused" (**Ex B**)  Dr Lee testified "I thought he went out, because he has activity card" (**Ex F**, p 73)  Dr Said testified a social worker told him the patient came in from outside and was confused (**Ex G**, p 60)  Nurse Owens' Progress Note of 7-31-95 at 2 30 p m  (which really was written at 1 35 p m , but a 2 was written over the 1, a 0 over the 3, and a 0 over the 5) indicates "patient had walked from CTP in hot sun"(**Ex N**)  Nurse Owens testified

I know that he went off the ward every day to some programs   I know he had

10

an activity card

\* \* \*

Q        Do you think Mr Terrance was outside at all that day?

A        he's normally outside, he's - he was normally in programs

\* \* \*

Q        You don't believe he was one of those patients who required supervision to and from the activities?

A        Right, right

(**Ex X**, p 34) NRPH's Answers to Interrogatories state that so long as a patient has a ground

card, they were outside (on July 31, 1995) (**Ex Y**) Dr Said's death summary indicates the

patient "came to the ward from the outside" (**Ex BB**), and the EMS report noted he had "been

out in sun, physically active about 1-1/2 hours, returned    agitated and confused" (**Ex DD**)

1        <u>Testimony From Plaintiff's Psychiatric Expert, David Schwartz, M.D.</u>

Dr Schwartz was highly critical of the tremendous dosages of anti-psychotic medications

received by Plaintiff's decedent He testified there was no need to prescribe so much Haldol,

Lithium and Cogentin, especially since there was no evidence of aggressive behavior In fact,

all the records indicate that Mr Terrence was quite cooperative (**Ex W**, p 17) Dr Schwartz

testified the quantities of the medications that he received were very likely to cause side effects

of a very severe nature, and were "much higher than I have ever seen used or use myself for this

diagnosis"(**Id**) With Mr Terrance's diagnosis of "schizo-affective schizophrenia", he should

have received much lower dosages (**Ex W**, pp 19-20) In fact, the use of Haldol and Lithium

was not necessary at all since numerous other anti-psychotic medications on the market could

11

FIEGER, FIEGER, SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

have been used to treat Mr Terrance's condition  Prescribing both oral Haldol and Lithium in large amounts was, according to Dr Schwartz, a deliberate indifference to Mr Terrance's serious medical needs (**Ex W, pp 19-20**)    In addition, Dr Schwartz had the following criticisms

- That in light of the facility's own protocol that patients be precluded from engaging in physical activity or strenuous exercise during high temperatures, it was both gross negligence and a deliberate indifference to Mr Terrance's serious medical needs to permit him to go outside on 7-31-95 (**Ex W, pp 40-42**)

- Dr Lee's failure to issue an Order on 7-31-95 mandating that all patients stay out of the heat is gross negligence as well as a deliberate indifference to Mr Terrance's serious medical needs (**Ex W, pp 42-43**)

- Without an air conditioned room, and with the perceived temperature being nearly 150° Fahrenheit, both Dr Lee and Dr Said had a duty to ensure Mr Terrance was placed in a cooler building, even if it meant transporting him off site  The failure to do this is gross negligence and a deliberate indifference to his serious medical needs (**Ex W, pp 43-44**)

- Even if the only information conveyed by Dr Lee and Nurse Owens was that this patient came in from the outside and was confused, this would be gross negligence and a deliberate indifference to his serious medical needs since they actually knew of his temperature, his sweating, and elevated blood pressure (**Ex W, pp 44-45**)

- The staff's failure to ensure the availability of essential emergency medical equipment, including ice, a rectal thermometer, and enema supplies amounted to gross negligence and a deliberate indifference to the serious medical needs of Mr Terrance (**Ex W, p 45**)

- It was both gross negligence and deliberate indifference to the serious medical needs of Mr Terrance for Dr Said not to respond for 30-60 minutes after he was told that the patient was stumbling, was confused, had a temperature of 103 5 (**Ex W, pp 45-47**)

2    **Testimony From Plaintiff's Cardiology Expert Robert Stark, M D.**

Attached as **Ex GG** is the expert report from Dr Stark summarizing his general opinions and criticisms regarding this case which was attached as an exhibit to his discovery deposition (**Ex I, pp 18-19**)  Dr Stark is board certified in both internal medicine and cardiology  Dr

Stark's opinions can essentially be summarized as follows

- The failure to maintain an adequate temperature within the facility, especially during the hot summer months (**Ex I**, pp 10-11),

- Dr Said's failure to pursue, focus or follow up on the patient's complaints of chest pain and abnormal EKG's (pp 15-16),

- Dr Said's failure to advise the patient's treating psychiatrist that this patient had underlying cardiac problems (pp 15-16),

- Dr Lee's and Dr Sadasivan's administrations of large doses of Haldol in combination with Lithium, especially in a patient with known heart disease (pp 16-17),

- The addition of Cogentin to the patient's medication regimen of Haldol and Lithium, especially with the patient's known heart disease (**Id**),

- Nurse Owens' failure to bring to the attention of Dr Said the patient's problems with sweating and excessive water drinking (if she indeed failed to do so) (p 21),

- The medical staff's (meaning the medical team in charge of his care) failure to closely monitor the patient for early evidence of neurologic toxicity (which can cause hyperthermia), including subtle changes in the patient's behavior, thinking, walking, or coordination, as evidenced by the lack of detailed notes (pp 23-24),

- The rapid escalation in the Haldol doses with no apparent reason therefor, beginning on 7/20, including injections 10 times greater than the initial oral doses, thus producing side effects like hyperthermia (pp 24-27),

- Failing to conduct routine temperature checks for fever/heat and tolerance all the way through the end of the patient's admission (pp 27-28),

- The failure of Dr Said to place Mr. Terrance on special restrictions refraining him from going outside on 7-31-95, since it was known to be a very hot day (p 29),

- Dr Said's delay in arriving upon the ward on 7-31-95 after being requested to do so, said delay amounting to 30-60 minutes (**Id**),

- The failure of Dr Lee, Nurse Owens, and the rest of the staff to start immediate cooling of the patient while waiting for Dr Said to arrive (including surface cooling with sheets, water, towels, etc ) (p 30),

13

- Failing to have appropriate equipment on the ward, including the rectal thermometer and the ice water enema (pp 30-31),

- The failure of Nurse Owens and Dr Lee to re-page Dr Said when it was apparent he was not arriving within 5-10 minutes (p 31),

- Dr Said's failure to administer anti-hyperthermia medications (Dantrolene) to reverse the hyper thermic situation (p 32)

- The Medical Director's failure to procure and stock one of the known medications used to treat hyperthermia contributed to by psycho-tropic medications (p 40)

- If true, as averred by Dr Said, that the only information conveyed to him by the nurse on 7-31-95 was that the patient came in from outside and was confused and was not advised of additional information, including elevated temperature and profuse sweating, then the nurse's failure in doing so (pp 41-42)

- Permitting Mr Terrance to go outside on 7-31-95 in light of the extreme heat (pp 42-43)

- Dr Said's failure to warn the treating psychiatrist (Dr Lee) of the patient's cardiac condition, at least by the time that she was prescribing both Haldol and Lithium which thus placed him at an increased risk of heat stroke in light of his cardiac condition (p 44)

Dr Stark testified that all of the above criticisms amount to both gross negligence and a deliberate indifference to the patient's serious medical needs with the exception of Dr Said's initial failure to inform the psychiatrist of Mr Terrance's underlying cardiac problems (**Ex I**, pp 34-40) Dr Stark is of the opinion that had defendants appropriately treated and supervised Mr Terrance, as outlined above, his death wold have been prevented (**Exhibit GG**, p 3)

14

**ARGUMENT**

I     <u>42 USC 1983 Claims Against Individual Defendants</u>

    A    <u>Plaintiff has claims against the individual Defendants for violating his rights under the 8th and 14th amendments of the United States Constitution</u>

Not only is Plaintiff asserting an 8th amendment right to medical care, as defined under *Williams* v *Mehra*, 186 F3d 685 (6th Cir 1999), but because Plaintiff's decedent was involuntarily confined to the NRPH, Plaintiff also has a 14th amendment claim  The due process clause of the 14th amendment accords Mr  Terrance with the right to adequate food, shelter, clothing and medical care  *Youngberg* v *Romeo*, 457 US 307, 315 (1982)  The involuntarily committed also have a claim to safe conditions since the Supreme Court rationalized

> If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed - who may not be punished at all - in unsafe conditions

*Id*, at 315-316  Furthermore, the involuntarily committed are accorded greater rights under the 14th amendment than the criminals are under the 8th amendment

> Persons who have been involuntarily committed are  entitled to more considerate treatment in conditions of confinement than criminals whose conditions of confinement are designed to punish

*Id*, at 321-322  An  individual may impose civil liability against professionals violating such rights

> when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment

*Id*, at page 323  Furthermore, under the 14th amendment

15

FAX (248) 355 5148    TELEPHONE (248) 355 5555  •  SOUTHFIELD MICHIGAN 48075 2463  •  19390 WEST TEN MILE ROAD  •  ATTORNEYS AND COUNSELORS AT LAW  •  A PROFESSIONAL CORPORATION    FIEGER, FIEGER, SCHWARTZ & KENNEY  •  A PROFESSIONAL CORPORATION

> the state also has the unquestioned duty to provide reasonable safety for
> all residents and personnel within the institution

*Id*, at page 324  Also, Plaintiff is asserting an 8th amendment right to medical care  Such a claim

can be made if Plaintiff presents sufficient evidence to establish a question of fact as to whether

defendants were deliberately indifferent to the Plaintiff's decedent's serious medical needs  The

Sixth Circuit Court of Appeals in *Williams*, quoting from *Farmer v Brennan*, 511 US 825 (1994)

stated as follows

> it is enough that the official acted or failed to act despite his knowledge of a
> substantial risk of serious harm    whether a prison official had the requisite
> knowledge of a substantial risk is a question of fact subject to demonstration in
> the usual ways, including inference from circumstantial evidence    and a fact
> finder may conclude that a prison official knew of a substantial risk from the very
> fact that the risk was obvious    For example, if an 8[th] amendment plaintiff
> presents evidence showing that a substantial risk    was 'longstanding, pervasive,
> well documented, or expressly noted by prison officials in the past', and the
> circumstances suggest that the defendant-official being sued had been exposed
> to information concerning the risk and thus 'must have known' about it, then such
> evidence could be sufficient to permit a trier of fact to find that the defendant-
> official had actual knowledge of the risk

*Williams*, quoting *Farmer*, 511 US at 842-43

In *Williams*, decedent was an inmate suffering from clinical depression with psychotic

features  While receiving psychotherapy treatments he indicated thoughts of suicide  Several

months later, he committed suicide by overdosing on pills prescribed for his depression  The

plaintiff filed an 8th amendment claim of deliberate indifference pursuant to 42 USC 1983

against the individual psychiatrists treating decedent, for failure to change his course of treatment

in light of his threats of suicide  The Court in *Williams* found that plaintiff did present a

sufficient claim for deliberate indifference since defendant's knew of the previous threats of

16

FAX (248) 355 5148 • TELEPHONE (248) 355 5555 • SOUTHFIELD MICHIGAN 48075 2463 • 19390 WEST TEN MILE ROAD • ATTORNEYS AND COUNSELORS AT LAW • A PROFESSIONAL CORPORATION FIEGER FIEGER SCHWARTZ & KENNEY

suicide, therefore imputing "actual knowledge of the serious *risk* of suicide" and that their continued course of treatment constituted deliberate indifference to that risk" *Williams, supra*

The federal courts have found the *deliberate indifference* standard to be met when the professional is *aware of the risk* of harm yet does nothing to alleviate the risk Lack of an actual knowledge of harm on the part of the defendant is not a defense if the facts are such that defendant *should have known* his actions would deprive plaintiff of his constitutional rights *Weeks* v *Chabowdy*, 984 F2d 185, 187 (6th Cir 1993) Defendant cites several such examples of deliberate indifference on page 12 of its Brief See also *Mandel* v *Doe*, 888 F2d 783 (11th Cir 1989)(a physician assistant's failure to inform his superior or a medical doctor of a prisoner's known injured leg), *Boretti* v *Wiscomb*, 930 F2d 1150 (6th Cir 1991)(a prison nurse's refusal to treat an inmate's surgical wound for five days or to provide dressing or pain medication), *Reed* v *Dunham*, 893 F2d 285 (10th Cir , 1990)(a prison staff's two hour delay in providing medical care to an inmate known to have been stabbed)

An analysis of the facts of this case will show that Plaintiff does have sufficient evidence to present an 8th amendment claim of deliberate indifference to the decedent's serious medical needs Of course, if Plaintiff can establish the 8th amendment claim, he certainly establishes the lower standard for the 14th amendment claim wherein Plaintiff need only establish that the Defendants committed a substantial departure from accepted professional judgment

Defendants attempt to argue that the expert testimony submitted by Plaintiff's experts was only couched in terms of negligence, and therefore, Plaintiff's claims cannot amount to deliberate indifference However, as already referenced above, Defendants conveniently ignore the rest

of the experts' deposition testimony wherein it clearly sets forth opinions of both gross negligence (meaning Michigan's definition of a substantial disregard for whether an injury results) as well as a deliberate indifference to the decedent's serious medical needs

### Defendant Ardeshir Emani Said, M.D. (Ex G)

As indicated above, Dr Said was the assigned internist for Plaintiff's decedent and was certainly aware of the numerous health risks confronting Mr Terrance  Dr Said knew this patient was suffering from hypertension and had abnormal EKGs  He was aware Mr Terrance was 260 lbs (obese), and diabetic (pp 10, 29)  He knew the patient was on Lithium, Haldol and Cogentin, and testified that these drugs placed him at an increased risk for heat stroke (page 31)

Dr Said also testified seeing 7 to 8 prior cases of nonfatal hyperthermia at NRPH, as well as 2 to 3 prior fatal cases  On 7/31/95, he was aware that the weather was extremely hot and humid (p 50)  Pursuant to the hospital's own protocol, Dr Said should have written an order restricting Mr Terrence to stay within a cool area  Because he did not do so, Mr Terrance apparently went outdoors and over-exerted himself, causing him to collapse

Despite being page by the medical staff at 1 30 pm, Dr Said did not arrive for an hour  Mr Terrance went without any  essential treatment during this crucial time period  Not only are Plaintiff's experts critical of Dr Said, but so is his own medical staff  Both Dr Lee and Nurse Owens complained to their supervisors about Dr Said's delay in responding to their call

### Defendant O. R. Lee, M.D. (Ext F)

Dr Lee was the designated psychiatrist for all the patients located on C1-1S in July, 1995  She also testified she was aware this particular unit was unusually hot during the summer

seasons and even acknowledged that the heat became a health danger to the patients (p 12)

Dr Lee was also aware the psycho tropic medications Mr Terrance was on put him at risk for getting hyperthermia (pp 25-26) Lithium is excreted by the kidney, creating the tendency to lose electrolytes, causing dehydration(p 27) Dr Lee testified to her understanding of "neuroleptic malignant syndrome," a disease process wherein psycho tropic medications cause hyperthermia She testified the main symptoms of drug induced hyperthermia are stiffness within the body and/or extremities, restlessness and elevated blood pressure (pp 33- 35)

On July 13, Dr Lee wrote a note restricting Mr Terrance to the ward for several days (pp 41-47) Notwithstanding signs of dehydration in the hot weather, beginning on July 17, 1995, Dr Lee order increased doses of Haldol, thus increasing his risk for hyperthermia Over the next several days, she added, Paxil, another psycho-tropic drug, and doubled his Haldol, adding the long acting form of Haldol (**Ex N**, Progress Notes, 7-17-95 through 7-19-95) Mr Terrance is noted to be consuming large amounts of water

On July 25, 1995 Dr Lee noticed the patient to have a hand tremor and stiffness, for which she prescribed an anticholinergic, again increasing the risk of heat stroke At this point in time, Mr Terrance is exhibiting drug induced hyperthermia, but is getting yet more drugs, while in a hot environment, ever increasing his risk

On July 31, 1995, the day was so hot that Dr Lee wanted all of the patients to stay indoors (p 72) However, she admitted that those with activity cards, including Mr Terrance, were still permitted to go out that day[1] (**Id**) This was probably the most blatant disregard of a known risk to Mr Terrance's serious medical needs The hospital's own policy precludes such

FIEGER FIEGER SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 2463 • TELEPHONE (248) 355 5555 FAX (248) 355 5148

a course of action

When she discovered Mr Terrance stumbling down the hallway at 1 30 p m , she immediately suspected hyperthermia but waited nearly an hour for Dr Said to arrive on the ward to render the necessary medical care and treatment  Plaintiff's experts have testified that Dr Lee should only have tolerated Dr Said's absence for a few minutes, and if no response, then immediately contacted another physician or the emergency medical team

**Defendant Shirley Owens, R N.** (Ex F)

Nurse Owens was a designated nurse for the medical team for Mr Terrance, as well as his primary therapist   Not only was she the sole nurse on Mr Terrance's treatment team, but on 7-31-95, Dr Said testified that Nurse Owens was the only nurse there   (**Ex G**, p 62)

Though her initial nursing assessment indicates Mr Terrance needed supervision while off the ward, she testified to the opposite in her deposition (p 34)   Also, the inference that Nurse Owens did refer him to CAT or CTP on 7-31 is certainly substantiated by her Progress Note which indicates that when she attempted to find out where he had been on 7-31, she called the CAT program but was told he had not been there that day (**Ex N**, Progress Notes 7-31-95) Referring Mr Terrance to off ward activities, in dark clothing, on a 150 degree day is in direct contravention of the hospital's own policy   If Nurse Owens did permit Mr Terrence to go outdoors, she could have at least provided supervision to prevent him from engaging in dangerous, strenuous activity

Nurse Owens also should have made sure the unit was equipped with the proper medical equipment, including the ice water enema, rectal thermometer, and ice   Not only are Plaintiff's

20

FIEGER, FIEGER, SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

FIEGER FIEGER SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD SOUTHFIELD MICHIGAN 48075 2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

experts critical of Nurse Owens and the NRPH staff for not stocking these supplies (Dr Almasi, Medical Director, in particular) but so was Dr Said He testified he was extremely angry at Nurse Owens because this equipment was not on the ward (**Ex G**, pp 79-80)

Nurse Owens waited too long for Dr Said to arrive on the ward prior to assisting Dr Lee in calling the medical emergency Nurse Owens' Progress Note indicates Dr Said was not called until 2 00 p m (thus making it appear Dr Said was only ½ hour late) but a close look reveals that she transcribed the 2 00 on top of the time of 1 35 This time was contradicted by Dr Lee's Discharge Summary indicating that Dr Said was called at 1 30 p m It is interesting to note that when Dr Lee was asked how she knew it was 1 30 p m when she called Dr Said, she testified she referred to the nursing notes† (Apparently Nurse Owens did not yet alter the time when Dr Lee referred to her note when preparing her discharge summary) (**Ex F**, pp 89-90)

**Defendant Dr. Almasi (Exhibit E)**

Dr Almasi has been the Medical Director of NRPH ever since 1990 (p 7) His responsibilities and duties include drafting all of the facility's policies and procedures (p 8) Dr Almasi testified that because of this incident involving the lack crucial equipment, he now enforces a policy requiring nurses to periodically check equipment (pp 9, 12) The incident has also prompted him to place ice machines all around the hospital (pp 18-19) Because of Mr Terrance's death, Dr Almasi also adopted a policy of stocking Dantrolene, and has spearheaded an effort directing medical professionals on how to observe for signs and symptoms of hyperthermia and how to treat and manage same ( p 22) While these policies will certainly help the patients presently at NRPH, they were too late to help plaintiff's decedent

21

Prior to becoming the Medical Director, Dr Almasi worked as a physician for 5-6 years within the C Building, which has always been known by him to be extremely hot all year round (p 49)   Certainly Dr Almasi was aware of the prior cases of hyperthermia    Certainly Dr Almasi knew that psychiatric patients are at risk for hyperthermia   To have failed to enact these policies prior to the death of Mr Terrance is a deliberate indifference to not only Mr Terrance's serious medical needs, but all the patients at NRPH

### Emergency Medical Team Defendants

As indicated in Dr Said's death summary (**Ex BB**), the emergency medical team which finally arrived to help Dr Said was composed of Dr Nair, Dr Kim, Dr Pan, and Dr Almasi, all of whom are Defendants in this case    Dr Said's summary describes how these individuals assisted in starting an IV in both arms, as well as maintaining an airway via nasopharyngeal tube   As discussed above, one of the IV's was not inserted properly, such that the vital fluids attempting to be administered in an effort to cool the body were not reaching Mr Terrance   Also, it is a deliberate indifference for these individual members of the emergency medical team in failing to procure ice or enema equipment which was so vital to cool Mr Terrance's system

As testified to by Defendant Nair, when he arrived on the scene, Mr Terrance was basically comatose (**Ex CC**, pp 20-21)  He testified that in treating a patient with hyperthermia, it is necessary to cool down the patient and bring down the temperature in the manner of IV's, cold IV's, cooling ice and cold enemas (pp 25-26)  Ice water enemas certainly should have been part of the treatment for Mr Terrance (p 27)

22

FIEGER, FIEGER, SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075 2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

FIEGER FIEGER SCHWARTZ & KENNEY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075 2463 • TELEPHONE (248) 355 5555 • FAX (248) 355 5148

B        **The Individual Defendants Are Not Entitled to Qualified Immunity**

Defendants are not entitled to the defense of "qualified immunity" for two reasons  First,

since the defense applies only to government officials performing "discretionary functions "

*Harlow* v *Fitzgerald*, 457 US 800 (1982)  Second, Defendants were on notice regarding the law

of deliberate indifference to an inmate's serious medical needs before the date of this incident

See *Estelle* v *Gambele*, 429 US 97 (1976), *Bass* v *Wallenstein*, 769 F2d 1173 (7th Cir , 1985)

Much of the deficient care and treatment provided by the Defendants herein was not

discretionary   For example, the facility's own hot weather precautions advised the staff to

refrain from allowing patients such as Mr Terrance to engage in physical activity on days where

the heat and humidity attained a certain temperature  Defendants failed to comply with their own

policy and procedure  There was no discretion involved  In addition, Dr Lee  testified that on

the day of 7-31-95 she did not feel any of the patients should have been outdoors (which is

exactly what the policy recommends) but then encouraged patients to go off the ward  Why she

failed to issue an order restraining Mr Terrance and all other patients on the ward is mind

boggling, and rises above the performance of a discretionary function

The actions of Dr Said on July 31, 1995 also rise above mere discretionary functions

Dr Said was told by the medical staff to present himself immediately in light of the emergent

condition of Plaintiff's decedent  There is no exercise of discretion under such circumstances

Dr Lee's and Nurse Owen's refusal to contact another physician, or call the emergency medical

team while waiting for Dr Said to arrive, also rises above the level of a discretionary function

Dr  Lee's refused  to withhold or limit the administration of Haldol after Mr  Terrance

23

began exhibiting reactions Instead she aggressively increased the doses, doubling, even tripling same This goes beyond mere discretion

Defendants make a vain argument they are entitled to qualified immunity since they were not placed on notice that their actions were depriving the decedent of his constitutional rights The leading case on the deliberate indifference to a patient/inmate's serious medical needs is *Estelle* v *Gamble*, 429 US 97 (1976) which was decided long before this incident As pointed out by *Bass* v *Wallenstein*, 769 F2d 1173 (7th Cir 1985), where the deliberate indifference or willful neglect standard had been established prior to the subject incident, defendants have notice of potential civil liability *Id* at 1186

Prior to his death from a heart attack, the decedent in *Bass* requested medical attention because he was not "feeling well " Staff members contacted the facility's physicians indicating that decedent's situation was an emergency, and requested immediate assistance As in the case at bar, the physicians in *Bass* simply failed to promptly respond and the decedent died

*Bass* is also significant to this case as the medical administrator of the facility therein was accused of not implementing proper policies and procedures to ensure the proper functioning of the medical unit *Bass*, at 1181 Because plaintiff's expert testified that the policies and procedures were insufficient, the Court upheld the plaintiff's 1983 claim against the administrator, since the policies were 'insufficient to ensure the inmate's access to medical care" *Bass*, at 1184 In light of *Bass*, the Defendants in the case at bar, including the Medical Director Defendant Dr Almasi, were placed on notice that their actions could subject them to civil liability

**II**     **PLAINTIFF'S CAUSE OF ACTION AGAINST NRPH AND MICHIGAN DEPARTMENT OF MENTAL HEALTH**

Plaintiff concedes to the argument set forth in the Defendants' Brief

**RELIEF REQUESTED**

WHEREFORE, Plaintiff requests this Honorable Court DENY Defendants' Motion for

Summary Judgment with respect to the Defendants discussed above

Respectfully submitted,

*FIEGER, FIEGER, SCHWARTZ & KENNEY, P.C.*

GEOFFREY N  FIEGER (P30441)  *Todd J. Weglarz*
TODD J  WEGLARZ  (P48035)
Attorneys for Plaintiffs
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555

Dated  June 7, 2000

---

**PROOF OF SERVICE**

On June 7, 2000, I served via First Class Mail a copy of the foregoing upon all counsel of record at their respective addresses, and declare under penalty of perjury that this statement is true to the best of my knowledge, information and belief

_Susan L. Jarvis_
Susan L. Jarvis

---

TELEPHONE (248) 355 5555  •  FAX (248) 355 5148     19390 WEST TEN MILE ROAD  •  SOUTHFIELD  MICHIGAN 48075 2463     ATTORNEYS AND COUNSELORS AT LAW     FIEGER  FIEGER  SCHWARTZ & KENNEY  •  A PROFESSIONAL CORPORATION

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

EUGENE TERRANCE, as Personal Representative
for the Estate of EVERETT L TERRANCE,
Deceased

     Plaintiff,

v

    Case No 99-CV-74433-DT-DT
    Hon Lawrence P Zatkoff

NORTHVILLE REGIONAL PSYCHIATRIC
HOSPITAL, MICHIGAN DEPARTMENT OF
MENTAL HEALTH, H BLANDA, M D ,
ARDESHIR EMANI SAID, M D , O R LEE, M D ,
DR SADASIVAN, M D , SHIRLEY OWENS, R N ,
B FANNING, O T , DR NAIR, DR KIM, DR
PAN, and DR ALMASI, jointly and severally,

    Defendants

| | |
|---|---|
| GEOFFREY N FIEGER (P30441) | MARK S MEADOWS (P24101) |
| TODD J WEGLARZ (P48035) | Attorney for Defendants |
| Attorneys for Plaintiff | Assistant Attorney General |
| FIEGER, FIEGER, SCHWARTZ & KENNEY, P C | Mental Health Division |
| 19390 W Ten Mile Rd | One Michigan Avenue, Suite 300 |
| Southfield, MI 48075 | Lansing, Michigan 48909 |
| (248) 355-5555 | (517) 373-6096 |

## AFFIDAVIT OF GEOFFREY NELS FIEGER
## and TODD J. WEGLARZ

STATE OF MICHIGAN  )
              ) ss
COUNTY OF OAKLAND)

    Geoffrey Nels Fieger and Todd J Weglarz, being duly sworn, each deposes and says
as follows

    1    That I have read, and understand, the Local Court Rules for the Eastern
District of Michigan

Geoffrey Nels Fieger (P30441)        Todd J Weglarz (P48035)

Subscribed and sworn to before me
this 7TH day of June, 2000

Notary Public

MARY JOAQUIN
NOTARY PUBLIC STATE OF MICHIGAN
WAYNE COUNTY
MY COMMISSION EXP JULY 27,2000